ACCEPTED
06-15-00049-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
10/13/2015 11:22:43 AM
DEBBIE AUTREY
CLERK

NO. 06-15-00049-CV

IN THE COURT OF APPEALS
FOR THE SIXTH DISTRICT OF TEXAS
TEXARKANA, TEXAS

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
10/13/2015 11:22:43 AM
DEBBIE AUTREY
Clerk

CRISTINA MARENTE individually
and as representative of the
ESTATE OF CHRISTIAN MARENTE, Deceased,
*Appellants*

v.

EUNICE ASHA, and EPIC HEALTH SERVICES, INC.
*Appellees*

On Appeal from Cause Number 86812
From the 40th District Court of Ellis County, Texas

AMENDED BRIEF FOR APPELLANTS
(WITH APPENDIX)

ORAL ARGUMENT REQUESTED

Douglas T. Floyd
Attorney for Appellants
3336 Therondunn Dr.
Plano, Texas 75023
214-704-7081
469-519-9488 FAX
T.B.N. 07181700
lawyerfloyd@aol.com

# IDENTITY OF PARTIES AND COUNSEL

PLAINTIFF/APPELLANT: CRISTINA MARENTE individually and as representative of the ESTATE OF CHRISTIAN MARENTE, Deceased

DEFENDANTS/APPELLEES: EUNICE ASHA, and EPIC HEALTH SERVICES, INC.

COUNSEL FOR PLAINTIFF/APPELLANT:
Douglas T. Floyd
3336 Therondunn Dr.
Plano, Texas 75023
214-704-7081
469-519-9488 FAX
T.B.N. 07181700
lawyerfloyd@aol.com

COUNSEL FOR EUNICE ASAH/APPELLEE
David M. Walsh, IV
Peter Anderson, Chamblee, Ryan, Kershaw and Anderson, P.C.
2777 N. Stemmons Freeway, Suite 1157
Dallas, Texas 75207
214-905-2003
214-905-1213 FAX
dmwalsh@chambleeryan.com

COUNSEL FOR EPIC HEALTH SERVICES, INC./APPELLEE
Winston L. Borum
BORUM & HANCOCK, L.L.P.
2485 Burnett Plaza
801 Cherry Street, Unit 414
Fort Worth, TX 76102
817-336-4100
817-336-41412 FAX
borum@borumhancock.com

PRESIDING JUDGE AT TRIAL:
Hon. Robert Carroll
40th District Court
Ellis County, Texas
201 Caroline, 11th Floor
Houston, Texas 77002
101 South Main Street
Waxahachie, Tx 75165
972-825-5060
972-825-5061 FAX

i

# TABLE OF CONTENTS

IDENTITY OF THE PARTIES AND COUNSEL .................................. ii

TABLE OF CONTENTS ......................................... iii

INDEX OF AUTHORITIES ........................................ v

STATEMENT OF THE CASE ...................................... 1

ISSUES PRESENTED ........................................... 2

STATEMENT OF FACTS ........................................ 3

SUMMARY OF THE ARGUMENT .................................. 8

ARGUMENT ................................................. 9

A.    Dr. Marabel's report was sufficient to satisfy the requirements of TEX. CIV. PRAC. &

      REM. §74.351 ......................................... 12

B.    Nurse Binghams' report was sufficient to satisfy the requirements of TEX. CIV. PRAC.

      & REM. §74.351 ......................................... 12

C.    No expert report was necessary with respect to Appellants' claims for vicarious liability

      against Epic Health Services, Inc. ................................. 20

PRAYER .................................................... 20

CERTIFICATE OF SERVICE ...................................... 21

CERTIFICATE OF COMPLIANCE ................................... 21

APPENDIX .................................................. 22

    a.    Order on Defendants Eunice Asah's and Epic Health Services, Inc.'s Objections

        to Plaintiff's Amended Chapter 74 Expert Reports and Motions to Dismiss

    b.    Expert Report of Patti Bingham, RN

    c.    Curriculum vitae of Patti Bingham, RN

d.      Expert Report of Dr. Charles Marable, M.D.

e.      Curriculum vitae of Dr. Charles Marable, M.D.

f.      Civ. Prac. & Rem. Code Subchapter H Procedural Provisions Sec. 74.351, Sec.

74.402 and Sec. 403

# INDEX OF AUTHORITIES

## CASES

*Adeyemi v.Guerrero*, 329 S.W.3d 241 (Tex. App.-Dallas 2010, no pet.) .................. 9

*Ballan v. Gibson*, 151 S.W.3d 281 (Tex. App.—Dallas 2004, no pet.) ..................... 16

*Blan v. Ali*, 7 S.W.3d 741 (Tex. App.—Houston [14th Dist.] 1999, no pet.) .............. 11

*American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873
(Tex. 2001) ........................................................................... 12, 13

*Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15
(Tex.App.-Tyler 2000, pet. denied) ......................................... 18

*Larson v. Downing*, 197 S.W.3d 303 (Tex. 2006) ............................. 9

*Gray v. CHCA Bayshore, L.P.*, 189 S.W.3d 855
(Tex.App.-Houston [1st Dist.] 2006, no pet.) ........................... 9

*Group v. Vicento* , 164 S.W.3rd 724 (Tex.App.-[Houston 14th Dist] 2005) ............. 17, 18

*Obstetrical & Gynecological Assocs., P.A. v. McCoy*, 283 S.W.3d 96
(Tex. App.-Houston [14th Dist.] 2009, pet. denied). ..................... 20

*Rittger v. Danos*, 332 S.W.3d 550
(Tex. App.—Houston [1st Dist.] 2009, no pet.) ......................... 11

*Scoresby v. Santillan*, 346 S.W.3d 546 (Tex. 2011) ......................... 9, 10

*Packard v. Guerra*, 252 S.W.3d 511 (Tex.App.-Houston [14 Dist.] 2008) ............... 19

## STATUTES

Tex. Civ. Prac. & Rem. §74 ............................................... 18

Tex. Civ. Prac. & Rem. Code Ann. § 74.351 ................. 2, 9, 11, 12 13, 16, 19

Tex. Civ. Prac. & Rem. § 74.351 (r)(5)(A)-(B) ............................ 19

Tex. Civ. Prac. & Rem.. §74.351(r)(6) ................... 2, 8, 9, 11, 12, 13, 16, 19

Tex. Civ. Prac. & Rem. § 74.401 ............................... 11, 14, 19

Tex. Civ. Prac. & Rem. § 74.402 ............................ 14, 16, 17, 18, 19

Tex. Civ. Prac. & Rem. § 74.402(b)(1) ................................... 17, 18, 19

Tex. Civ. Prac. & Rem. § 74.402(a)(2) ................................... 17, 18, 19

TEX. GOV'T CODE ANN. § 311.005(13) (Vernon 2005) ........................... 18

## STATEMENT OF THE CASE

This is a health case liability claim involving nursing negligence against Eunice Asah, R.N. (hereinafter referred to as "Nurse Asah"), and her employer, Epic Health Services, Inc., which was originally filed on March 4, 2013, in Ellis County, Texas, (CR 7) and subsequently amended on March 27, 2013. (CR 16). Patti Bingham, R.N. and Dr. Charles Marable, M.D. prepared initial expert reports which were subsequently amended and served on Defendants on August 29, 2013. (CR 197). On September 17, 2013, Epic Health Services filed Defendant Epic Health Service, Inc.'s Objection to Plaintiff's Amended Chapter 74 Expert Reports & Motion to Dismiss. (CR 199). On September 18, 2013, Asah filed Defendant Eunice Asah's Objections to Plaintiffs Amended Chapter 74 Expert Reports & Motion to Dismiss. (CR 219). On June 23, 2015, the District Court granted Defendants' motions to dismiss on all Plaintiffs' issues and signed an Order on Defendant Eunice Asah & Epic Health Services, Inc.'s Objections to Plaintiff's amended chapter 74 Expert Reports & Motions to Dismiss. (CR 379 ).

## ISSUES PRESENTED

1. Were the expert amended reports provided to the Appellees in compliance with Tex. Civ. Prac. & Rem. 74.351(a)?

2. Did the amended expert reports comply with the requirements of Tex. Civ. Prac. & Rem. 74.351(r)(6) and put the Appellees on notice of the conduct called into question?

3. Did the district court err in dismissing the claims of vicarious liability against an employer of a health care provider on the basis of the expert reports?

## STATEMENT OF FACTS

On September 10, 2012, CHRISTIAN MARENTE, hereinafter Christian, was a seventeen-year-old male with a history of Jeune syndrome and restrictive lung disease. Jeune syndrome (asphyxiating thoracic dystrophy, ATD) is a rare autosomal recessive skeletal dysplasia [dysplasia is an abnormality within the cells of tissue that affects growth, development and function] characterized by a small, narrow chest and variable limb shortness. There is a considerable neonatal mortality as a result of respiratory distress. Renal, hepatic, pancreatic, and ocular complications may occur later in life. Christian had respiratory complications that had left him with a tracheostomy and mechanical-ventilator dependent. He had asthma and chronic kidney disease and had received a kidney transplant in July 2007. On September 10, 2012 CHRISTIAN was on oxygen 2 liters at all times. At night, he was on the ventilator; thus requiring 24 hour sitting provided by a home health service.

At approximately 5:00 p.m. on September 10, 2012, EUNICE ASAH, hereinafter Nurse Asah, a home health nurse provided by EPIC Health Services was bathing Christian in his home at 313 E. Freeman, Ennis, Texas. They were alone and while putting him "back to bed" the "tracheostomy" came out. As documented in the EMS Patient Care Report, Nurse Asah "made multiple attempts to place the trachea tube back into place but has been unsuccessful." Christian received Bag-Valve-Mask [BVM] ventilation and became pulseless. Nurse Asah began chest compressions. EMS was called and upon arrival continued Cardio- pulmonary resuscitation, obtained a blood pressure and then transported Christian to Children's Medical Center, Dallas, Texas for ongoing care. Christian had been pulseless approximately 10-15 minutes.

Nurse Asah initially stated she was "changing out his trach and the patient was moving around ... and it came out." Nurse Asah says she "made multiple attempts to place the trachea

3

tube back into place" but could not. According to the Discharge Summary from Children's Medical Center, she then tried to replace the trachea with a 5.5 trach tube, but was not successful. She then began bag-valve masking [BVM] Christian through his trachea in which she had told the 911 dispatcher the trach was "halfway in."

Nurse Asah spoke with the 911 dispatcher for a total of 6 minutes. During this time, she did not identify herself as a Registered Nurse. The 911 dispatcher wasted valuable time explaining to Nurse Asah how to complete the Cardio-pulmonary resuscitation [CPR] procedures.

EMS received the call at 17:23 and arrived at the home 17:28. Upon arrival, Christian did not have a pulse, and CPR was continued. EMS documented "Pt's trachea opening is blocked by the pt's neck." They noted inserting a "6.0mm ET tube through his trachea." They then transferred Christian to the airport where air-team emergency flight, Air Evac 74, met them and transferred Christian to Children's Medical Center in Dallas, Texas.

Christian was pronounced deceased on September 23, 2012.

Nurse Asah has reported at least two different reasons as to how the tracheostomy tube came out. Nurse Asah first reported in her 911 call that while putting Christian back to bed the tracheostomy came out. In response to interrogatories, Nurse Asah reported that she removed the tracheostomy in preparation to replacing the trach.

The first statement by Nurse Asah implies that the trach came out accidently. The second statement makes it clear that Nurse Asah removed the trach intentionally. What is important is that Cristina Marente was the only person that ever changed the tract and never changed the trach on Nurse Asah's shift. Nurse Asah try to ignore the fact that the replacing of the trach was not her responsibility and she should have never have undertaken the procedure of removing the

4

trach for the purpose of replacing the trach on the date in question. The removing and replacing of the trach in the home was the sole responsibility of the mother, Cristina Marente. Second, Nurse Asah ignores the fact that the removing and replacing of the trach was never done on her shift. It was always done on the following shift with another nurse present when Cristina Marente changed the trach.

As set forth in Appellants' First Amended Petition:(CR 18-19).

NEGLIGENCE - BREACH OF STANDARD OF CARE:

a.      Among the Significant Breaches in Standard of Care by EPIC Health Services, Inc., and through its employee, EUNICE ASAH, RN:

      i.      ASAH's conduct fell below nursing Standard of Care when she failed to properly care for the trach.

      ii.      ASAH's conduct fell below nursing Standard of Care when she failed to immediately call appropriate emergency medical assistance when the patient showed initial signs of distress.

      iii.      ASAH's conduct fell below nursing Standard of Care when she failed to give the 911 dispatcher the correct street address of 311 East Freeman Street.

      iv.      ASAH's conduct fell below nursing Standard of Care when she failed to immediately identify herself as a registered nurse resulting in unnecessary delay.

      v.      ASAH's conduct fell below nursing Standard of Care when she failed to properly communicate with the 911 operator.

      vi.      ASAH's conduct fell below nursing Standard of Care when she failed to

remain calm and collected in a professional manner.

vii. ASAH's conduct fell below nursing Standard of Care when she failed to have the proper training for home health care for tracheostomy patients.

b. To achieve positive outcomes in patients with trach tubes, every nurse needs to keep abreast of the best practices, develop, and maintain the necessary skills. A nurse who performs trach care needs to be familiar with their facility's policy and procedure. Per the Six-Step Decision-Making Model for Determining Nursing Scope of Practice in Texas, "A nurse always has a duty to his/her clients/patients to assure that they are safe. One of the most important actions a nurse can take toward that goal is making sure that he/she only accepts those assignments for which the nurse has the education, training, and skill competency. Physical and emotional ability can also impact a nurse's ability to maintain client safety when accepting an assignment."

c. Plaintiffs assert that the care rendered to CHRISTIAN MARENTE by EPIC HOME SERVICES, INC., and EUNICE ASAH did not meet nursing Standard of Care. ASAH should have:

i. Properly maintained Christian's tracheostomy while transferring or changing the trach site.

ii. Immediately called Emergency personnel for additional help.

iii. Identify Registered Nurse qualifications to appropriate authorities to avoid unnecessary delay in additional assistance.

iv. Maintain a composed, professional conduct while under an emergency situation.

6

v.    Follow the American Heart Association's guidelines for Cardio-pulmonary resuscitation.

vi.    Instituted appropriate nursing interventions that required stabilization in a patient's condition.

vii.    Been properly trained in the care of a tracheostomy patient and in how to properly act in an emergency situation.

## SUMMARY OF THE ARGUMENT

Nurse Bingham's amended expert report fulfills the requirement of Tex. Civ. Prac. & Rem. §74.351(r)(6). She fully discusses the standard of care, how the standard was breached by Nurse Asah, and how the breach led to Christian's injuries. Furthermore, the report is more than sufficient to inform the Nurse Asah of the conduct called into question and provides a basis for the trial court to conclude that the claims have merit.

Dr. Marable's amended expert report fulfills the requirements of TEX. CIV. PRAC. & REM. §74.351(r)(6). He fully discusses the standard of care, how the standard was breached by Nurse Asah, and how the breach led to Christian's injuries with respect to Nurse Asah's conduct. Furthermore, the report is more than sufficient to inform Nurse Asah of the conduct called into question and provides a basis for the trial court to conclude that the claims have merit.

No expert report was necessary with respect to Appellants' claims for vicarious liability against Epic Health Services. The court erred by dismissing those claims on the basis of Epic Health Services's objections to the expert report.

## ARGUMENT

The issue in this Appeal is whether or not Nurse Bingham's amended expert report and Dr. Marable's amended expert report fulfills the requirement of Tex. Civ. Prac. & Rem. §74. The Courts have said, "In determining whether an expert is qualified, we must be careful not to draw expert qualifications "too narrowly." *Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006); *Adeyemi v.Guerrero*, 329 S.W.3d 241, 247 (Tex. App.-Dallas 2010, no pet.). Defendants attempt to frame the argument around the medical condition of Christian to avoid addressing the specific negligent acts of Nurse Asah that essentially have nothing to do with his medical condition and therefore ask the court to narrowly define the expert qualifications necessary to fulfill the requirements of Tex. Civ. Prac. & Rem. §74.

A health care liability claimant must timely provide each defendant healthcare provider with an expert report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351; *Gray v. CHCA Bayshore, L.P.,* 189 S.W.3d 855, 858 (Tex.App.-Houston [1st Dist.] 2006, no pet.) The report must provide a "fair summary" of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standard, and the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem. Code Ann. §74.351(r)(6).

If a defendant health care provider files a motion to dismiss, challenging the adequacy of a claimant's expert report, a trial court must grant the motion if it appears, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report or is not sufficiently specific to provide a basis for the trial court to conclude that the claims have merit. *Id.* § 74.351(l); *Scoresby v. Santillan*, 346 S.W.3d 546, 555–56 (Tex. 2011). In setting out the expert's opinions, the report must provide enough information to fulfill two

9

purposes: (1) it must inform the defendant of the specific conduct that the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Scoresby*, 346 S.W.3d at 556.

We will address the qualifications and sufficiency of Dr. Marable's expert report first because essentially the same argument applies to the qualifications and sufficiency of Nurse Bingham's expert report.

### AS CONCERNS DR. MARABLE

As stated above, Defendants attempt to frame the argument around the medical condition of Christian to avoid addressing the specific negligent acts of Nurse Asah that essentially have nothing to do with his medical condition, when Nurse Asah states:

"But the issue is not whether Nurse Asah is qualified to treat Christian in this setting, but whether *Dr. Marable* is qualified to offer opinions about a pediatric home health care nurse treating a patient such as Christian under these circumstances. And that is where Dr. Marable 's report fails. He does not state that he is familiar with the nursing standard of care applicable to nurses (1) caring for a pediatric patient with Jeune syndrome/restrictive lung disease; (2) with a tracheostomy requiring the administration of continuous oxygen therapy and nighttime ventilation with a mechanical ventilator; (3) in the home health care setting; and — most importantly -- (4) requiring tracheostomy tube changes, such as was performed by Nurse Asah in this case, or (5) responding to an emergency situation such as the one faced by Nurse Asah in this case." (CR 232)

The only real issue concerns number (5) above as to the appropriate response by Nurse Asah to the specific emergency situation she created made the basis of this suit.

Dr. Marable's report was sufficient to satisfy the requirements of Tex. Civ. Prac. & Rem.

10

74.351. Additionally, Dr. Marable is fully qualified under Tex. Civ. Prac. & Rem. 74.402 to offer opinions in this case.

Nurse Asah alleges that Dr. Marable was not qualified under Tex. Civ. Prac. & Rem. 74.402 to render an opinion as to the standard of care applicable to Nurse Asah in this case. (CR 233)

"The expert testifying in a medical malpractice case need not be a specialist in the particular branch of the profession for which testimony is offered; the statute setting out the requisite qualifications focuses not on the defendant doctor's area of expertise, but on the condition involved in the claim." *Rittger v. Danos*, 332 S.W.3d 550, 558 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *Blan v. Ali*, 7 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 1999, no pet.)).

Dr. Marable is more than qualified to testify about the standard of care for a nurse like Nurse Asah performing the duties she was suppose to be performing at the time with Christian. Nurse Asah continues to focus her arguments on the medical condition of Christian and not on the extensive medical history of Dr. Marable in working with nurses.

The medical condition of the patient in this case is not the proper inquiry under Tex. Civ. Prac. & Rem. 74.401. Dr. Marable articulated very clearly in his expert report, both in the introduction (CR 253) and the section titled "QUALIFICATIONS" as to his experience as to the matters made the basis of this suit and with the Standard of Care" (CR 254-263) that he is familiar with the standard of care for a nurse watching a patient under the circumstances in this case and that Nurse Asah breached that standard of care.

Dr. Marable's report complies with the requirements of Tex. Civ. Prac. & Rem. §74.351(r)(6) with respect to all Appellees.

11

"An expert report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). Dr. Marable's report did exactly what the Supreme Court ruled it must in *Palacios*. In his report, Dr. Marable discussed, in detail, the standard of care, what specific conduct of each defendant breach said standard of care, and how that breach proximately caused Christian's injuries. The district court gave no reasoning for granting the motions to dismiss, but a dismissal for failure to comply with the requirements of Tex. Civ. Prac. & Rem. §74.351(r)(6) would constitute an abuse of discretion and cannot be upheld.

Tex. Civ. Prac. & Rem. §74.351(r)(6) requires only "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." A motion to dismiss should only be granted if "the report does not represent an objective good faith effort to comply with [that] definition." Tex. Civ. Prac. & Rem. §74.351(l).

Dr. Marable's report fulfills all three requirements of Tex. Civ. Prac. & Rem. §74.351(r)(6). He summarizes his opinions as to the applicable standards of care, the manner in which the care rendered by Nurse Asah failed to meet those standards, and the causal relationship between that failure and the injury, harm, or damages claimed. (CR 254-263)

In a lengthy paragraph in the standard of care section of his report, Dr. Marable explains, in detail, the causal link between Nurse Asah's actions and Christian's injury. (CR 256) He reiterates and elaborates upon several points in paragraphs in the breach of the standard of care

12

(CR 258-258) and causation (CR 262-263) sections of his report.

As required by Tex. Civ. Prac. & Rem. §74.351(r)(6) and Palacios, Dr. Marable's report informed Nurse Asah of the specific conduct called into question. Based on Christian's as created by Nurse Asah and the specific steps Nurse Asah should have taken specific identified actions set forth in his report. (CR 261-262)

## AS CONCERNS EPIC HEALTH SERVICES

Dr. Marable's report addresses Appellants' direct liability claims against Epic Health Services. As he did with conduct of Nurse Asah, he explained, in detail, how Epic Health Services caused Christian's injuries. Epic Health Services should have had protocols for evaluation, consultation, admission, and follow-up that resulted in adequate care of patients should an emergency condition arise. The failure to have in place and abide by such protocols was a breech in the standard of care." (CR 261-262)

"Epic Health Services' failed [sic] to have or implement adequate protocols for evaluation consultation, admission, and follow-up that resulted in adequate care of this patient with dural sinus thrombosis and idiopathic intracranial hypertension. The failure to have in place and abide by such protocols was a breech in the standard of care that was a proximate cause of Christian's death. (CR 262-263) The foregoing paragraphs in Dr. Marable's report are clearly sufficient to "inform the defendant of the specific conduct the plaintiff has called into question" and to "provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 879.

## AS CONCERNS NURSE BINGHAM

Nurse Bingham's report was sufficient to satisfy the requirements of Tex. Civ. Prac. & Rem. 74.351. The same argument for Dr. Marable applies to Nurse Bingham.

Nurse Bingham is fully qualified under Tex. Civ. Prac. & Rem. 74.402 to offer opinions in this case.

Nurse Asah's objection to Nurse Bingham's report because "Nurse Bingham's criticisms of Nurse Asah solely relate to her handling of the September 10, 2012 tracheostomy incident." (CR 227). That is absolutely correct, because that is the only time Nurse Asah negligently caused the trach to be removed and panicked when she could not put the trach back in. The care and treatment provided by Nurse Asah up until the incident was adequate because Nurse Asah never changed or removed the trach before the date in question.

Nurse Asah attempts to beguile the issues by concentrating on the medical condition of Christian and implying that only someone that has treated a patient with Jeune syndrome/restrictive lung disease in a home health care environment can give an opinion on the negligence of a nurse that negligently removes a trach and then panics when she cannot re-insert the trach. That is not a requirement to qualify as an expert under CPRC §74.402.

Nurse Bingham is certified and qualified as a registered nurse and is actively practicing health care in rendering health care services relevant to the claim. Nurse Asah's duties on the date in question were as a "sitter" that stayed with Christian and observed him. Her duties included washing and feeding Christian; monitoring the breathing equipment and periodically suctioning mucus out of his tracheostomy. Nurse Bingham has more qualifications and experience as a registered nurse than Nurse Asah and Nurse Bingham's qualifications and experience clearly show that she knows the standard of care in an emergency situation such as that created by Nurse Asah on September 10, 2012.

Nurse Bingham addressed the proper standard of care for a home health care nurse in her report. (CR 243)

14

1. Monitor the vital signs of Christian per the Skilled Nursing Flowsheet daily;

2. To annotate the Skilled Nursing Flowsheet daily;

3. Monitor the ventilator equipment;

4. Monitor the mucus build up in the trach and suction the mucus out periodically;

5. Clean around the trach opening;

6. Observe Christian for any signs of stress or difficulty breathing;

7. Bath Christian as required.

Nurse Bingham stated in her report that Nurse Asah did breached the standard of care.

(CR 243-245)

"It is my opinion that on September 10, 2012, Nurse Asah breached the Standard of Care applicable to Eunice Asah, RN, as follows:

1. Nurse Asah, RN breached the nursing Standard of Care when she removed the trach from Christian; a procedure that was not her responsibility.

2. Nurse Asah, RN breached the nursing Standard of Care when she failed to immediately call appropriate emergency medical assistance when the patient showed initial signs of distress.

3. Nurse Asah, RN breached the nursing Standard of Care when she failed to give the 911 dispatcher the correct street address of 311 East Freeman Street.

4. Nurse Asah, RN breached the nursing Standard of Care when she failed to immediately identify herself as a registered nurse resulting in unnecessary delay.

5. Nurse Asah, RN breached the nursing Standard of Care when she failed to properly communicate with the 911 operator.

6. Nurse Asah, RN breached the nursing Standard of Care when she failed to remain calm and collected in a professional manner.

7. Nurse Asah, RN breached the nursing Standard of Care when she failed to have the proper training for home health care for tracheostomy patients.

The expert report of Nurse Bingham clearly shows that she is a person qualified as an

15

expert witness to opine as to the standard of care against Nurse Asah, a health care provider in a health care liability lawsuit, because Nurse Bingham:

(1)     is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time of testimony is given or was practicing that type of health care at the time the claim arose;

(2)     has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury or condition involved in the claim; and

(3)     is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care. (CR 240)

Tex.Civ.Prac. & Rem. Code §74.402(b)

The expert report of Nurse Bingham clearly provides a "fair summary" of the expert's opinions as of the date of the report regarding: (1) the applicable standards of care, (2) the manner in which the care rendered by the physician or health care provider failed to meet the standards, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem. Code § 74.351(r)(6); see also *Ballan v. Gibson*, 151 S.W.3d 281, 283 (Tex. App.—Dallas 2004, no pet.).

The heart of Nurse Asah's objections to Nurse Bingham is that she does not qualify as an expert under CPRC § 74.402 because the only person that can qualify is an expert is a registered nurse sitting at the home of a juvenile patient with Jeune syndrome and restrictive lung disease that has a tracheostomy on September 10, 2012. This is because Nurser Asah allege that the "field of practice" is a "registered nurse sitting at the home of a juvenile patient with Jeune

16

syndrome and restrictive lung disease that has a tracheostomy on September 10, 2012" and only a "registered nurse sitting at the home of a juvenile patient with Jeune syndrome and restrictive lung disease that has a tracheostomy on September 10, 2012" is the only *field of practice that involves the same type of care or treatment as that delivered* by Defendant Asah.

Plaintiffs' position is that the "field of practice" is that of a registered nurse in Texas for which Nurse Bingham is more than qualified to opine on.

Nurse Asah's position is an overly restrictive interpretation of CPRC § 74.402. The issue of an overly restrictive interpretation of CPRC § 74.402 was addressed in *Group v. Vicento* , 164 S.W.3rd 724 (Tex.App.-[Houston 14ᵗʰ Dist] 2005). *Group* involves the issue of a chiropractic standard of care. *Group* argued beginning at p. 730,

> "... under section 74.402(b)(1), to qualify as an expert witness on the issue of whether Group departed from accepted standards of care, Dr. Saqer must be "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose. "TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1). Group argues the term "practicing health care" as defined by subsection (a) *requires* a qualified expert in a chiropractic malpractice case to either be a chiropractor, train chiropractors at an accredited educational institution, or serve as a consulting health care provider to chiropractors and be licensed, certified, or registered as a chiropractor. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(a)(1), (2) ("For purposes of [section 74.402], 'practicing health care' *includes:* (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.") (emphasis added). Group contends Dr. Saqer does not meet the statutory definition of "practicing health care." In response, Vicento argues Dr. Saqer's report demonstrates he has
>
> **Page 731**
>
> adequate knowledge, skill, experience, training, and education regarding his treatment of patients with conditions similar to Vicento's to qualify him as an expert under subsection (b)(1).
> Group's asserted construction of section 74.402, subsections (a)(1)-(2) and (b)(1), improperly limits and confines the definition of the term "practicing health care." Subsection (a) uses the term "includes" in defining "practicing health care." Although

17

Chapter 74 does not define the term "includes," the Code Construction Act defines "includes" as a term "of enlargement and not of limitation or exclusive enumeration, and use of [includes] does not create a presumption that components not expressed are excluded." TEX. GOV'T CODE ANN. § 311.005(13) (Vernon 2005); *see Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25-26 (Tex.App.-Tyler 2000, pet. denied). Thus, section 74.402(a)'s two definitions of "practicing health care" are not exclusive.

In addition, under the literal language of section 74.402(b)(1), an expert is only required to be "practicing health care *in a field of practice that involves the same type of care or treatment* as that delivered by the defendant health care provider." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(1) (emphasis added). Subsection (b)(1) does not require an expert to be practicing health care *in the same field* as the defendant health care provider, here, the field of chiropractic. Instead, under subsection (b)(1), the expert only must practice health care in a field of practice *involving the same type of care or treatment.* [5]

Reading section 74.402 subsections (a) and (b)(1) together, subsection (a) expands upon the definition of "practicing health care" to *include* qualified teachers and consulting health care providers who may not otherwise be qualified under subsection (b)(1) because they are not *practicing* health care and instead teach or consult. Group's proffered construction of subsection (a) and (b)(1) results in a person being qualified as an expert *only if* the person trains health care providers *in the same field* as the defendant health care provider *or* if the person serves as a consulting health care provider and is licensed, certified, or registered in the same field as the defendant health care provider. According to Group, if a person practices health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, but the person is not certified in the same field of practice as the defendant

**Page 732**

health care provider, is not a teacher, or is not a qualified consultant, the person is unqualified.

*Group's* asserted construction of section 74.402(a) is unnecessarily restrictive and is contrary to the plain and common meaning of the language of the statute. Having considered the language of section 74.402 in its entirety, we disagree with Group that the two definitions of "practicing health care" under section 74.402(a) are exclusive."

As in *Group*, Plaintiff argues that CPRC § 74.402 is not to be interpreted so overly restrictive as to disqualify Nurse Bingham simply because as Defendant Asah claims, she is not a "registered nurse sitting at the home of a juvenile patient with Jeune syndrome and restrictive lung disease that has a tracheostomy on September 10, 2012." *Group* clearly stands for the proposition that CPRC § 74.402 is not to be interpreted so overly restrictive as requested by

18

Defendants. Further more, *Group,* at 731 " (section 74.402(b)(1) does not require expert to be practicing in same field, only in field of practice involving same kind of care)."

As concerns the claim by Defendant Asah that Nurse Bingham (and Dr. Marable) relied on the statement of Cristina Marente that she was the only person that ever changed the trach of Christian Marente, and that the statement is somehow unreliable and irrelevant and that such statement under section 74.402(d) relates to the admission of testimony at trial, Plaintiff points to *Packard v. Guerra,* 252 S.W. 3d 511 (Tex.App.-Houston [14 Dist.] 2008) where the court stated at 530,

> "... the plain language of the Medical Liability Act does not limit the two sections to trial. To start narrowly, the headings of sections 74.401 and 74.402 are entitled, "Qualifications of an Expert Witness in Suit Against a [Physician/Health Care Provider]" ; they do not limit the sections to experts testifying at trial. Even more obviously, sections 74.401 (f) and 74.402 (f) discuss pre-trial objections to the qualifications of an expert witness, making it appear that the sections cover the whole spectrum of expert witnesses in a health care liability suit from pre-trial to trial. Another section in the Act also suggests a broader interpretation. Subsection 74.351(r)-which contains the definitions for section 74.351 , entitled "Expert Reports" -defines an expert who is qualified to give an expert report (pre-trial) as one who is qualified to testify under sections 74.401 and 74.402 . *See* TEX. CIV. PRAC. & REM. CODE § 74.351 (r)(5)(A)-(B).[15] It does not limit the qualifications to 74.401(a)-(c) and 74.402(a)-(c)-those sections referring specifically to physicians and health care providers. It includes all of sections 74.401 and 74.402 , including the exceptions contained in 74.401(d) and 74.402(d). Thus, an expert report, which is filed only 120 days after suit and will before trial, includes the report of an expert described in the "good cause" exception of sections 74.401 (d) and 74.402 (d). This plain language also does not seem to support a presumption that the good cause exceptions contained in sections 74.401 (d) and 74.402 (d) apply only at trial.

And in *Packard* at p. 532 the Court clearly stated,

> "For these reasons, we hold that sections 74.401(d) and 74.402(d) are available for use at the expert report phase of a health care liability claim."

The exact meaning of Section 74.402(d) is a little more difficult to determine because Appellants found no cases on point:

> (d) The court shall apply the criteria specified in Subsections (a), (b), and © in determining whether an expert is qualified to offer expert testimony on the issue of

whether the defendant health care provider departed from accepted standards of health care but *may depart from those criteria if, under the circumstances, the court determines that there is good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.*

Defendant Asah continues to assert that the only nurse that qualified to testify as an expert is one that has committed negligence by removing a trach without authority, authorization or reason and then failed in an attempt to inset the trach. Clearly, this is not what was intended by Medical Liability Act.

## NO EXPERT REPORT NECESSARY FOR VICARIOUS LIABILITY

## AGAINST EPIC HEALTH SERVICES

In addition to the direct liability claims Appellants asserted against Epic Health Services, Appellant also alleged that "Epic Health Services is vicariously liable for negligence of its nurses, technicians, servants and or agents who are its actual agents, apparent agents, ostensible agents, and agents by estoppel acts and/or omissions." With respect to Appellants' claims against Epic Health Services for vicarious liability for the conduct of Nurse Asah, Nurse Bingham and Dr. Marable's report was not required to address them. In fact, no expert report is needed at all for claims of vicarious liability based upon ostensible agency. *Obstetrical & Gynecological Assocs., P.A. v. McCoy*, 283 S.W.3d 96, 107 (Tex. App.-Houston [14th Dist.] 2009, pet. denied).

## PRAYER

For the foregoing reasons, Appellants respectfully requests this honorable court to reverse the judgment and remand this case to the district court for trial on the merits.

Respectfully submitted,

/S/ Douglas T. Floyd
COUNSEL FOR PLAINTIFFS/APPELLANTS

Douglas T. Floyd
3336 Therondunn Dr.
Plano, Texas 75023
214-704-7081
469-519-9488 FAX
T.B.N. 07181700
lawyerfloyd@aol.com

## CERTIFICATE OF SERVICE

I certify that a copy of this Brief for Appellant has been served upon the opposing counsel either by hand delivery, U.S. mail, or facsimile.

/S/ Douglas T. Floyd
**DOUGLAS T. FLOYD**

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes.

/S/ Douglas T. Floyd
DOUGLAS T. FLOYD

# APPENDIX

1. Order on Defendants Eunice Asah's and Epic Health Services, Inc.'s Objections to Plaintiff's Amended Chapter 74 Expert Reports and Motions to Dismiss

2. Expert Report of Patti Bingham, RN

3. Curriculum vitae of Patti Bingham, RN

4. Expert Report of Dr. Charles Marable, M.D.

5. Curriculum vitae of Dr. Charles Marable, M.D.

6. Civ. Prac. & Rem. Code Subchapter H Procedural Provisions Sec. 74.351, Sec. 74.402 and Sec. 403

1. Order on Defendants Eunice Asah's and Epic Health Services, Inc.'s Objections to Plaintiff's Amended Chapter 74 Expert Reports and Motions to Dismiss

| | | |
|---|---|---|
| CRISTINA MARENTE | § | IN THE 40TH JUDICIAL |
| INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE | § | |
| ESTATE OF CHRISTIAN | § | |
| MARENTE, DECEASED | § | |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| EUNICE ASAH AND EPIC | § | |
| HEALTH SERVICES, INC. | § | ELLIS COUNTY, TEXAS |

## ORDER ON DEFENDANTS EUNICE ASAH'S AND EPIC HEALTH SERVICES, INC.'S OBJECTIONS TO PLAINTIFF'S AMENDED CHAPTER 74 EXPERT REPORTS AND MOTIONS TO DISMISS

CAME ON to be heard(1) Defendant Eunice Asah's Objections to Plaintiff's Amended Chapter 74 Expert Reports and Motion to Dismiss and (2) Defendant Epic Health Services, Inc.'s Objections to Plaintiff's Amended Chapter 74 Expert Reports and Motion to Dismiss. After reviewing and considering the Motions, Plaintiff's Response, and the pleadings on file with the Court, the arguments of counsel at the two properly-noticed hearings on the Motions, and the subsequent additional briefing by the parties as requested by the Court, the Court rules that Defendants' Objections are **SUSTAINED** and rules that Defendants' Motions to Dismiss are **GRANTED**.

**ORDER ON DEFENDANTS OBJECTIONS AND MOTION TO DISMISS   Page 1**

## IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED

that (1) Defendant Eunice Asah's Objections to Plaintiff's Amended Chapter 74 Expert Reports are **SUSTAINED** and Defendant Eunice Asah's Motion to Dismiss is **GRANTED** and (2) Defendant Epic Health Services, Inc.'s Objections to Plaintiff's Amended Chapter 74 Expert Reports are **SUSTAINED** and Defendant Epic Health Services, Inc.'s Motion to Dismiss is **GRANTED**. Plaintiff's claims against all Defendants are, therefore, dismissed with prejudice. The Court orders that Plaintiff take nothing against Defendants, who are hereby discharged.

## IT IS FURTHER ORDERED, ADJUDGED, AND DECREED

**THAT** the Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs as required under Section 74.351(b) of the Texas Civil Practice & Remedies Code as follows:

The amount of $ 47,360.00 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, for recovery of reasonable and necessary attorneys' fees and court costs for work performed in this case.

The Court further orders that Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs in the amount of $ 25,000.00 from Plaintiff Cristina Marente,

ORDER ON DEFENDANTS OBJECTIONS AND MOTION TO DISMISS    Page 2

Individually and as Representative of the Estate of Christian Marente, Deceased, in the event of an ultimately unsuccessful appeals to the Court of Appeals.

Additionally, the Court further orders that Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs in the amount of $ _10,000.00_ from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, if Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, files a petition for review and review is not granted by the Supreme Court of Texas or if Defendant Eunice Asah seeks review in the Supreme Court of Texas that is ultimately successful.

Additionally, the Court further orders that Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs in the amount of $ _17,500.00_ from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, if briefing on the merits is requested in the Supreme Court of Texas but review is ultimately denied (i.e. a petition for review is denied) or this Court's ruling is ultimately affirmed by the Supreme Court of Texas.

**ORDER ON DEFENDANTS OBJECTIONS AND MOTION TO DISMISS    Page 3**

The Court further orders that Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs in the amount of $ 7,500.00 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, in the event that a petition for review is granted by the Supreme Court of Texas and oral argument occurs in the case but review is ultimately denied or this Court's ruling is ultimately affirmed.

The Court further orders that Defendant Eunice Asah recover her reasonable and necessary attorneys' fees and court costs in the amount of $ -0- in the event that Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, seek rehearing in the Supreme Court of Texas but that motion is ultimately denied.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED THAT** the Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys' fees and court costs as required under Section 74.351(b) of the Texas Civil Practice & Remedies Code as follows:

The amount of $ 10,000.00 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian

Marente, Deceased, for recovery of reasonable and necessary attorneys' fees and court costs for work performed in this case.

The Court further orders that Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys' fees and court costs in the amount of $ 8,333 33 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, in the event of an ultimately unsuccessful appeals to the Court of Appeals.

Additionally, the Court further orders that Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys' fees and court costs in the amount of $ 3,333 33 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, if Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, files a petition for review and review is not granted by the Supreme Court of Texas or if Defendant Epic Health Services, Inc. seeks review in the Supreme Court of Texas that is ultimately successful.

Additionally, the Court further orders that Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys'

fees and court costs in the amount of $ 5,833.33 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, if briefing on the merits is requested in the Supreme Court of Texas but review is ultimately denied (i.e. a petition for review is denied) or this Court's ruling is ultimately affirmed by the Supreme Court of Texas.

The Court further orders that Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys' fees and court costs in the amount of $ 2,500.00 from Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, in the event that a petition for review is granted by the Supreme Court of Texas and oral argument occurs in the case but review is ultimately denied or this Court's ruling is ultimately affirmed.

The Court further orders that Defendant Epic Health Services, Inc. recover its reasonable and necessary attorneys' fees and court costs in the amount of $ 0 in the event that Plaintiff Cristina Marente, Individually and as Representative of the Estate of Christian Marente, Deceased, seeks rehearing in the Supreme Court of Texas but that motion is ultimately denied.

These rulings complete the Court's resolution of Defendants Eunice Asah's and Epic Health Services, Inc.'s Objections to Plaintiffs' Amended Chapter 74 Expert Reports and Motions to Dismiss so that this Order (1) constitutes a final judgment regarding Plaintiff's claims against Defendants Eunice Asah and Epic Health Services, Inc., (2) resolves all claims against all parties, and therefore (3) constitutes a final appealable order.

SIGNED on this the _____ day of ___JUN 2 3 2015___, 2015.

_____
**BOB CARROLL**
**JUDGE PRESIDING**

## 2. Expert Report of Patti Bingham, RN



**Patti Bingham, RN**
106 Calle Ricardo
Victoria, Texas  77904
Cell: (361) 652-3558
Fax:  (361) 575-8312
pattirnnurse@yahoo.com

## PROFESSIONAL EXPERIENCE

4/4/11 –
Present
**The Courtyards, [Rehabilitation & Nursing Home]** 3401 E. Airline, Victoria, Tx 77901
Weekend RN supervisor – Supervisor/Clinical responsibilities include overseeing all nursing care throughout the facility, monitoring vital signs, passing medications, change dressings, trach care, conduct range of motion exercises, check the status of wounds, administer enemas and start intravenous [IV] medications and fluids.

2/25/11 –
Present
**Blackburn Group, Inc.,** 6709 Glenkirk Road, Baltimore, MD. 21239
[Medicare Set Aside (MSA) and Claim Settlement Solutions Company]
Assisting with MSA/Future medical cost projections (including Workers Compensation)

1/2/2011 –
Present
**Jackson Davis Healthcare,** 3570 E. 12th Ave, Denver, Colorado 80206
Medicare Audit Defense and Medicare Appeals – Nurse Auditor

01/2008
–12/28/2010
**Citizens Medical Center,** 2501 Medical Drive, Victoria, Texas 77901
**Charge/Staff Nurse of Day Surgery**
- Responsibilities include clinical and supervisory: starting IV's, managing Foley catheters, assessing post-operative patients, managing and implementing patient care; staffing requirements; participating in Quality Assurance program; auditing medical records and following up with patient care satisfaction surveys.

5/25/06 –
02/21/08
**Triumph Hospital Victoria,** 506 E. San Antonio St, Victoria, Texas (PRN & Full Times Status)
- Charge Nurse/Clinical Staff Nurse - responsibilities included planning, managing, and assessing care, administration of medications and treatments, maintain record of codes and care, wound care, and assisted with wound VACs.
- Charge nurse/ Clinical Staff Nurse - Medical Observation Unit (comparable

Updated: 08/15/2013
P. Bingham

1



to Step Down Unit) – duties included starting IV's, monitoring patient's respiratory ventilation – tracheotomy's, intubations, pulse oximetry, respond to all codes, set nasogastric and monitor dobhoff feeding tubes, foley and swan ganz catheters, central and arterial lines, temporary pacemakers.

| | |
|---|---|
| 2003–2008 | **Hospice of South Texas, 605 Locust Ave., Victoria, Texas 77901** <br> **Admissions Coordinator / Case Manager / Clinical Nurse** |

- Responsible for coordinating admissions between hospitals, nursing homes, private homes, and respite care facilities along with durable medical equipment companies and pharmacies, coordinated care, and assessed and interpreted needs and requirements
- Responsible for clinical care of patients – Obtaining doctor's orders, starting and maintaining IV's catheters, Hypodermoclysis, Foley catheters, pain and nausea control, managing pain pumps, obtaining blood/urine for cultures, trach care, etc.
- **Case Management responsibilities:** Make initial assessments regarding patient treatment plans and establish collaborative relationships with physicians, clients, patients, and providers, coordinated patient's care, and assessed and interpreted needs and requirements, coordinated admissions with discharge planners from hospitals and transferring patients to Nursing Home's and family homes assuring the necessary medications and equipment were available.

| | |
|---|---|
| 07/27/1998–12/23/2003 | **Citizens Medical Center, 2501 Medical Drive, Victoria, Texas** <br> **Operating Room Staff Nurse** |

- Functioned as a circulating nurse in all surgical disciplines including, general, vascular, orthopedic, OB-GYN, urology, and primarily cardiac patients.
- Responsible for pre-operative and intra-operative phases of surgical experience, requiring knowledge of general and specialty equipment and instrumentation, comprehensive record keeping and review.
- Aided conscious sedation of patients undergoing heart catheterizations, angioplasties, liver biopsies, and peripheral vasculature runoff studies.

**Emergency Room**
- Charge nurse - responsibilities included managing and staffing a 15 bed emergency room department.
- Ensure the provision of quality emergency medical care to patients requiring emergency treatment in accordance with physician orders,

Updated: 08/15/2013
P. Bingham

2

hospital policy, and standard nursing practice.
- Triage and performed patient assessment and nursing diagnosis.

**1993-1998**
- Manage the planning and implementation of interventions.

**Matagorda General Hospital, 1115 Ave G, Bay City, Texas 77414**

**Operating Room Staff Nurse**
- Functioned as a circulating nurse in all surgical disciplines including, general, vascular, orthopedic, OB-GYN, and ENT
- Responsible for pre-operative and intra-operative phases of surgical experience, requiring knowledge of general and specialty

**Matagorda Home Health Agency**
- Duties included assessments of systems, wounds, intravenous sites, medications – subcutaneously or intramuscular injections, any ordered treatments – tracheostomy care; breathing treatments, blood draws, intravenous flushes, dressing changes, or wound care the doctor has ordered, and teaching as indicated.

**Trauma Coordinator / ER Staff Nurse**
- Provided oversight for all clinical policies and procedures in accordance with local and state accrediting body standards; Adhered to state Trauma guidelines and hospitals and State Trauma policies, procedures, and reporting requirement
- Made initial assessments regarding patient treatment plans and established collaborative relationships with physicians, families, patients, and providers, ensured that patients received the proper levels of care

- Ensure the provision of quality emergency medical care to patients requiring emergency treatment in accordance with physician orders, hospital policy, and standard nursing practice.
- Triage and performed patient assessment and nursing diagnosis.

## EDUCATION

- Associate in Applied Science Nursing, Wharton County Jr. College, Wharton, Texas – September 22, 1993
- Associate in Applied Science Registered Dental Hygiene, Bee County Jr. College, Beaville, Texas - June 30, 1980

## PROFESSIONAL CERTIFICATIONS

- Certified Adult, Child, & Infant CPR – American Heart Association 2010 Guidelines - Current
- N H T.I.L.E. Training on Long Term Care Standards for Medicaid – Texas State University, San Marcos; 6/20/2005

Updated: 08/15/2013
P. Bingham                                    3

- National Board for Certification of Hospice and Palliative Nurses (CHPN) – Inactive

- Certification Nurse Operating Room (CNOR) – Inactive
- Pediatric Advanced Life Support
- Advanced Cardiac Life Support
- Trauma Nursing Core Course

## PROFESSIONAL ASSOCIATIONS
- National Alliance of Certified Legal Nurse Consultants
- American Association of Legal Nurse Consultants

Updated: 08/15/2013
P. Bingham

4

**3.   Curriculum vitae of Patti Bingham, RN**



**Patti Bingham, RN**
106 Calle Ricardo
Victoria, Texas 77904
Cell: (361) 652-3558
pattirnnurse@yahoo.com

August 20, 2013

Douglas T. Floyd
Attorney at Law
6521 Preston Road, Suite 100
Plano, Texas 75024

RE:    Mr. Christian Marente

Dear Mr. Floyd:

Please accept this report as my expert report under Tex. Civ. Prac. & Rem. Code § 74.351. This report replaces the report of January 8, 2013 and June 22, 2013.

## RECORDS REVIEWED

In arriving at the opinion set out below in this letter, I have reviewed the following items:

1.    Medical records from Air Evac Lifeteam – 2 pages titled "Preliminary Patient Care Record" [Email: Medical_Records_ 1-25]
2.    Children's Medical Center medical records
3.    ETMC-EMS; Run Number: 110658; Date of Service: 09/10/2012; pages 1-4 of 4
4.    Outpatient Note from Our Children's House at Baylor 07/19/2012,
5.    Kidney Transplant Visit Note, 06/20/2012, 1-4 pages,
6.    Progress Note: Jose J. Salguero, MD Office Notes: 11/23/2011, 09/14/2011, 09/8/2011, 08/11/2011,
7.    Telephone Encounters.
8.    Skilled Nursing Flowsheets dated: 08/06/2012, 08/07/2012, 08/13/2012, 08/20/2012, 08/27/2012, 09/3/2010
9.    Skilled Nursing Flowsheet dated 09/10/2012 signed by Eunice Asah, R.N.
10.   Report of Cristina Marente.

## BACKGROUND

My name is Patti Bingham. I am a Registered Nurse in the State of Texas. My Texas Nursing Certification Number is 593336. I have been a registered nurse in Texas since September 22, 1993.

MARENTE 08/20/13                          PAGE 1



## QUALIFICATIONS

I am presently a registered nurse in Texas and have been so registered for over 20 years. I have continued to use my nursing skills within those 20 years. I have worked in both the emergency room and operating room at various hospitals in Texas. I have been certified in Pediatric Advanced Life Support and Advanced Cardiac Life Support. I am qualified to care for pediatric, adolescent, and adult patients in all nursing settings.

I presently work at The Courtyard Rehabilitation & Healthcare Center, 3401 E. Airline, Victoria, Texas, 77901, as a Registered Nurse supervisor. This 56-bed facility currently has 49 residents. The Center provides medical management and 24-hour skilled nursing care, including intravenous [IV] therapy with antibiotics, TPN administration, and diabetic therapy. The Center has physical medicine and rehabilitation and offer wound care. Rehabilitative services include Speech, Physical, and Occupational Therapy. My supervisory responsibilities include ensuring there is adequate nursing staff during the weekends and assessing the health needs of each resident. I supervise 3-4 Licensed Vocational Nurses [LVN] and 3-4 Certified Nurse Aides [CNA] during the weekends. I oversee the care these nurses give our patients and inform the physicians and families as patient care/conditions warrant. In addition to my supervisory duties, I work with the other nurses performing patient care. I monitor patients for signs of stress or difficulty breathing and perform complete, total assessments on patients. While I currently do not have tracheostomy patients at the facility, I have treated patients with tracheostomy at the nursing home many times in the past. I am personally familiar with the nursing standard of care to be delivered to patients with tracheotomies.

I have personal knowledge of the accepted standards of care for a registered nurse in Texas in the same type of care or treatment that Nurse Asah delivered to Christian Marente on September 10, 2012.

1.    On September 10, 2012 and at all relevant times to the present, I have practiced in the health care field of a registered nurse that involved the same type of care or treatment that Nurse Asah delivered to Christian Marente on that date. That type of care or treatment is more specifically identified below.

2.    I have knowledge of the accepted standards of care for a registered nurse of the care or treatment for the condition involved in the claim against Nurse Asah and Epic Health Services, Inc. My knowledge is of the accepted standards of care is more specifically indentified below; and

3.    I am qualified based on my 20 years of training and experience to offer an expert opinion regarding those accepted standards of care as shown in my curriculum vitae attached hereto.

## BRIEF HISTORY AND SUMMARY OF CARE

Christian Marente was a seventeen-year-old male with a history of Jeune syndrome and restrictive lung disease. Jeune syndrome (asphyxiating thoracic dystrophy, ATD) is a rare autosomal recessive skeletal dysplasia [dysplasia is an abnormality within the cells of tissue that

MARENTE 08/20/13            PAGE 2

affects growth, development and function] characterized by a small, narrow chest and variable limb shortness. There is a considerable neonatal mortality as a result of respiratory distress. Renal, hepatic, pancreatic, and ocular complications may occur later in life. Christian had respiratory complications that had left him with a tracheostomy and mechanical-ventilator dependent. He had asthma and chronic kidney disease and had received a kidney transplant in July 2007.

On January 5, 2012, Christian underwent a tracheostomy at Children's Medical Center Dallas.

On July 19, 2012, Christian had a medical check-up with Dr. Joseph Rosen at Our Children's House in Dallas, Texas. Per Dr. Rosen's notes, Christian was eating and drinking by mouth and was on continual oxygen at 2 liters per minute. He had not had any Emergency Room visits since 4/10/2012. Per his mother and Dr. Rosen's notes, Christian was "without coughing or wheezing." His tracheostomy cuff was deflated during the day and had 3 liters during the night.

Beginning in February 2012, Nurse Asah, provided general nursing services for Christian, usually from 7:00 a.m. until 7:00 p.m, Monday through Friday. Per the Flow Sheets Between August 6, 2012 and September 3, 2012, the general nursing services provided by Nurse Asah were:

Monitor the vital signs of Christian;
To annotate the Skilled Nursing Flowsheet daily;
Monitor the ventilator equipment;
Check the mucus build up in the trach and suction the mucus out periodically;
Clean around the trach opening;
Observe Christian for any signs of stress or difficulty breathing;
Bath Christian as required.

In the Skilled Nursing Flowsheets named above, at no time did Nurse Asah change Christian's tracheostomy.

It has been reported that on September 10, 2012, at approximately 5:00 p.m., Nurse Asah was bathing Christian in his home. There is conflicting information as to exactly what occurred next:

1.    Per the 911 call, Nurse Asah was alone and while putting Christian "back to bed" the "tracheostomy" came out.

2.    Per the Skilled Nursing Flowsheet Nurse Asah reported, "After I pulled out the dirty trach, I was unsuccessful inserting the clean 6.0 Bivona flex cuff trach. A second attempt with the 5.0 Bivona flex cuff trach available was unsuccessful."

3.    Per the response to an interrogatories propounded to Nurse Asah, her verified response was as follows:

INTERROGATORY NO. 8: Describe in detail everything that you did with CHRISTIAN MARENTE in the one hour before his trach tube came out on September 10, 2012.

MARENTE 08/20/13                    PAGE 3

241



ANSWER: Subject to and without waiving said objections, on September 10, 2012, Nurse Asah prepared to give Christian Marente a bath. She first laid out all of her supplies before getting started. That included the bath supplies, Christian's change of clothes, and all of the supplies for the tracheostomy change, including a clean 6.0 trach, a back-up (smaller) 5.0 trach, and an ambu bag - Christian's tracheostomy change occurred every Monday. Nurse Asah made all of these preparations before bathing Christian on September 10, 2012. Upon completing his bath and dressing Christian on September 10, 2012, Nurse Asah began to change his trach. The trach is held in place with soft ties that tie around his neck. She undid the ties and cleaned Christian's neck. In accordance with her standard procedure, which she had performed many times before, Nurse Asah then removed the existing trach and concurrently attempted to place the clean 6.0 trach into Christian's tracheostomy site, but it would not go in. She immediately grabbed the smaller, 5.0 trach and tried to place it into Christian's tracheostomy site, but it too would not go in. At that point, she immediately called 911 on her cell phone and proceeded to initiate CPR until emergency medical services arrived. In addition, please see the deposition of Nurse Asah when/if taken for further information concerning the care provided that day, as well as the relevant medical records related to this matter.

As documented in the EMS Patient Care Report, Nurse Asah "made multiple attempts to place the trachea tube back into place but has been unsuccessful." Christian received Bag-Valve-Mask [BVM] ventilation and became pulseless. Nurse Asah began chest compressions. EMS was called and upon arrival continued Cardio-pulmonary resuscitation, obtained a blood pressure and then transported Christian to Children's Medical Center, Dallas, Texas for ongoing care. Christian had been pulseless approximately 10-15 minutes but the exact time is unclear from the medical records.

As reported by Cristina Marente, the mother of Christian Marente, Nurse Asah had never changed the trach of Christian and the changing of the trach was never the responsibility of Nurse Asah. The changing of the trach was solely the responsibility of Cristina. Cristina had received special training in February 2012 at Baylor Hospital Dallas on the procedure for changing the trach. In fact, the medical records show that the trach was changed every Monday on the shift following the end of the shift of Nurse Asah. The procedure of changing the trach started in February 2012 and continued through September 3, 2012 when the trach was changed every Monday by Cristina shortly before Christian went to bed. The Skilled Nursing Flowsheet of Nurse Asah shows that the last time the trach was changed was September 3, 2012. The Skilled Nursing Flowsheet for Monday, September 3, 2012 shows that the trach of Christian was changed on the shift of Nurse Modupe Olojo that began at 7:00 p.m. on that date and on all proceeding Mondays during the relevant time period.

## BASIS OF EXPERT ANALYSIS

On September 10, 2012, at approximately 5:15 p.m. Nurse Asah was in the home of seventeen year-old Christian Marente providing general nursing care or treatment as set forth above when the trach was removed by Nurse Asah. Removing or changing of the trach was not the responsibility of Nurse Asah. Nurse Asah was unable to re-insert the trach or a second smaller trach. She then began bag-valve masking [BVM] Christian through his trachea in which she had told the 911 dispatcher the trach was "halfway in."

MARENTE 08/20/13                    PAGE 4

Nurse Asah spoke with the 911 dispatcher for a total of 6 minutes. During this time, she did not identify herself as a Registered Nurse. The 911 dispatcher wasted valuable time explaining to Nurse Asah how to complete the Cardio-pulmonary resuscitation [CPR] procedures.
Per EMS records, page 1/4, EMS received the call at 17:23 and arrived at the home 17:28. Upon arrival, Christian did not have a pulse, and CPR was continued. EMS documented "Pt's trachea opening is blocked by the pt's neck." They noted inserting a "6.0mm ET tube through his trachea." They then transferred Christian to the airport where air-team emergency flight, Air Evac 74, met them and transferred Christian to Children's Medical Center in Dallas, Texas.

## THE STANDARD OF CARE APPLICABLE TO NURSE ASAH ON 09/10/12:

The Standard of Care for a registered nurse is the level at which the average, prudent provider in a given community would practice. It is how similarly qualified practitioners would have managed the patient's care under the same or similar circumstances. In my opinion, the appropriate standard of care that Nurse Asah should have provided Christian Marente was dependent on the duties and responsibilities of Nurse Asah in caring for Christian. Those duties and responsibilities were to properly:

1.     Monitor the vital signs of Christian per the Skilled Nursing Flowsheet daily;

2.     To annotate the Skilled Nursing Flowsheet daily;

3.     Monitor the ventilator equipment;

4.     Monitor the mucus build up in the trach and suction the mucus out periodically;

5.     Clean around the trach opening;

6.     Observe Christian for any signs of stress or difficulty breathing;

7.     Bath Christian as required.

It is my opinion that the medical condition of the patient is not the determinative of the standard of care if the duties and responsibilities of the assigned nurse do not require any specialized training based on the patients actual medical condition. In this case, the fact that Christian had a history of Jeune syndrome and restrictive lung disease did not require Nurse Asah to have any specialized training to perform her assigned nursing duties as set forth above. Additionally, the location of the nursing services provided by Nurse Asah did not require any specialized training to perform her assigned nursing duties. The standard of care would be the same whether or not in a hospital, nursing home, or private home.

## BREACHES OF THE STANDARD OF CARE BY NURSE ASAH:

It is my opinion that on September 10, 2012, Nurse Asah breached the Standard of Care applicabale to Eunice Asah, RN, as follows:

MARENTE 08/20/13                    PAGE 5

1.  Nurse Asah, RN breached the nursing Standard of Care when she removed the trach from Christian; a procedure that was not her responsibility.

2.  Nurse Asah, RN breached the nursing Standard of Care when she failed to immediately call appropriate emergency medical assistance when the patient showed initial signs of distress.

3.  Nurse Asah, RN breached the nursing Standard of Care when she failed to give the 911 dispatcher the correct street address of 311 East Freeman Street.

4.  Nurse Asah, RN breached the nursing Standard of Care when she failed to immediately identify herself as a registered nurse resulting in unnecessary delay.

5.  Nurse Asah, RN breached the nursing Standard of Care when she failed to properly communicate with the 911 operator.

6.  Nurse Asah, RN breached the nursing Standard of Care when she failed to remain calm and collected in a professional manner.

7.  Nurse Asah, RN breached the nursing Standard of Care when she failed to have the proper training for home health care for tracheostomy patients.

To achieve positive outcomes in patients with trach tubes, every nurse needs to keep abreast of the best practices, develop, and maintain the necessary skills. A nurse who performs trach care needs to be familiar with their facility's policy and procedure. Per the Six-Step Decision-Making Model for Determining Nursing Scope of Practice in Texas, "A nurse always has a duty to his/her clients/patients to assure that they are safe. One of the most important actions a nurse can take toward that goal is making sure that he/she only accepts those assignments for which the nurse has the education, training, and skill competency. Physical and emotional ability can also impact a nurse's ability to maintain client safety when accepting an assignment."

It is my opinion, with a reasonable degree of nursing certainty that the care rendered to Christian Marente by Epic Home Service, Inc., and Nurse Asah did not meet the applicable nursing Standard of Care. It is my opinion Nurse Asah should have:

1.  Not have attempted to change the trach of Christian; a procedure that was not her responsibility.

2.  Immediately called Emergency personnel for additional help when she could not re-insert the trach.

3.  Immediately identify herself as a Registered Nurse qualifications to the appropriate authorities to avoid unnecessary delay in additional assistance.

4.  Maintain a composed, professional conduct while under an emergency situation.

5.  Follow the American Heart Association's guidelines for Cardio-pulmonary resuscitation.

MARENTE 08/20/13                    PAGE 6

6. Instituted appropriate nursing interventions that required stabilization in a patient's condition.

7. Been properly trained in the care of a tracheostomy patient and in how to properly act in an emergency situation.

## THE STANDARD OF CARE APPLICABLE TO EPIC HEALTH SERVICES, INC.

It is my opinion that based on my experience as a registered nurse and supervising nurse with duties to determine the treatment standards to be used by nurses under my responsibility that the applicable standard of care for Epic Health Services, Inc., are the treatment standards to be applied are to ensure that all patients receive appropriate care regardless of the setting and to only assign nurses to patients that meet those standards. Those standards of care include:

1. To ensure that nurses are properly trained to provide basic nursing services;

2. To ensure that nurses are properly informed to know the limitations of their assigned duties and responsibilities to assigned patients;

3. To properly instruct assigned nurses not to undertake nursing/medical procedures that are not the nurses assigned duties and responsibilities;

4. To ensure that assigned nurses have the appropriate communication skills, particularly in an emergency situation; and

5. To ensure that assigned nurses have the proper training and experience to remain calm and collected in an emergency situation.

## BREACHES OF THE STANDARD OF CARE BY EPIC HEALTH SERVICES, INC.

It is my opinion that on September 10, 2012 that Epic Health Services, Inc., breached the applicable standards of care for a medical provider of nursing services by assignment of Nurse Asah to provide nursing services to Christian Marente as follows: Epic Health Services, Inc., failed:

1. To ensure that Nurse Asah was properly trained to provide basic nursing services;

2. To ensure that Nurse Asah was properly informed to know the limitations of her assigned duties and responsibilities to Christian Marente;

3. To properly instruct Nurse Asah not to undertake nursing/medical procedures that are not her assigned duties and responsibilities;

4. To ensure that Nurse Asah had the appropriate communication skills, particularly in an emergency situation; and

5. To ensure that Nurse Asah had the proper training and experience to remain calm and

MARENTE 08/20/13                     PAGE 7

collected in an emergency situation.

My opinions are based on the information I have reviewed thus far and I reserve the right to change, supplement or amend that opinion if further information becomes available.

Respectfully,

Patti Bingham, RN

**4. Expert Report of Dr. Charles Marable, M.D.**





## CHARLES D. MARABLE, M.D.
Diplomat of the American Board of Neurology and Psychiatry
800 8th Ave., Suite 118
Fort Worth, Texas 76104

817-334-0338 OFFICE                                                          817-334-0586 FAX

August 20, 2013

Douglas T. Floyd
Attorney At Law
6521 Preston Road, Suite 100
Plano, Texas 75024

RE:    CAUSE # 86812; CHRISTIAN MARENTE v EUNICE ASAH AND EPIC HEALTH
       SERVICES, INC.

Please accept this as my amended formal expert report in the above case.

**RECORDS REVIEWED:** In arriving at the opinion set out later in this report, I have reviewed the following items:

Medical records from Air Evac Lifeteam
Children's Medical Center records
East Texas Medical Center. - EMS
Texas Department of State Health Services Vital Statistics Death Certificate
Outpatient notes from Our Children's House
Progress notes from Dr. Jose J. Salguero, M.D.
Skilled Nursing Flowsheet dated 09/10/2012 signed by Eunice Asah, R.N.
Matters related to me regarding statements of Cristina Marente concerning the treatment of Christian Marente

**BACKGROUND:** My name is Charles Douglas Marable, M.D. I am a Board Certified Neurologist, and my place of employment is 800 8th Ave., Suite 118, Fort Worth, Texas 76104.

**QUALIFICATIONS:** I am actively practicing medicine now, as well as the time the incident arose in an area relevant to the claim, I am Board Certified in Neurology. I have substantial training and expertise in the area relevant to this claim. I have the knowledge of accepted standards of medical care for the diagnosis, care and treatment of the injury, illness or condition involved in this incident, which is that of anoxic encephalopathy, as suffered by this patient. I am familiar with anoxic encephalopathy and have treated patients with this illness throughout my residence, as well as in my private office and hospital practice. I have seen literally hundreds of

CDM/MARENTE - 08/20/13               PAGE 1

patients who have sustained hypoxic as well as anoxic encephalopathy.

It is usually the neurology service that is consulted for episodes of anoxic encephalopathy, and usually the neurology service also asked to perform brain death examinations on patients.

Neurologists, as well as pulmonary medicine and neurosurgeons are usually the ones who have the ability in the ICU to handle ventilator settings.

I also have extensive expertise in dealing with pediatric as well as adult neurological cases. In fact, from 1986 to 2000, I did both pediatric and adult consults, and from 2000 to the present time, I still see young children, but they are usually over age 13 or 14.

I currently and since 1986 regularly refer my neurological patients for home health care. As a result for these referrals, I write the orders for home health care treatment for nurses and then follow up with the patient to insure that they received the prescribed care and continue to receive that care if it is on going. This is a very common situation in my office.

And although I am not a Registered Nurse, because of my experience since 1986 in referring patients for home health care and working with nurses that provide home health care for my patients, I am qualified to ascertain when a nurse should have adequate qualifications to treat certain illnesses in the home health care environment. I am qualified to state the standard of care for a nurse treating Christian Marente and opine on the breach of the standard of care. My experience and training in working with health care institutions such as Epic Health Services, Inc., qualify me to render an opinion as to the standard of care for such institutions and opine on the breach of the standard of care.

MEDICAL LEGAL STANDARD: Unless stated otherwise, all my opinions in this report are based upon the medical legal standard of reasonable medical probability.

FACTS OF CASE/OPINIONS: Christian Marente was a 17-year-old male, DOB 5/12/95, with a history of Jeune syndrome, and restrictive lung disease. Jeune disease is a hereditary hypoplasia of the thorax, or also known as asphyxiating thoracic chondrodystrophy. This syndrome is a rare genetic disorder that affects the way a child's cartilage and bones develop, it basically affects the child's ribcage, pelvis, arms and legs. Due to the ribcage being narrow, this keeps the child's lungs from developing fully or expanding when the child inhales. They can also develop problems with their kidneys. This is taken from the article, "Jeune Syndrome" at Seattle Children's Hospital in Washington.

On 8/11/11 Christian MARENTE was seen for the first time by Dr. Salguero, who, noted his neurologic exam was normal, he was walking well, He was very pleasant and smart.

On 9/8/11 he was seen again with a normal neurologic examination.

On 9/14/11, he is seen by Dr. Salguero, who noted he to be alert with a normal neurologic exam.

CDM/MARENTE - 08/20/13          PAGE 2

On 11/23/11 he was seen again by Dr. Salguero, and was noted to be fully alert. His neurologic exam showed he had a normal gait. The neck was supple. He had a negative Brudzinski's, negative Kernig's, no meningeal signs, no focal signs, and was normal. The physician's assessment at that time was unspecified asthma, COPD, renal failure and kidney transplant status.

On 7/19/12 he was seen by Dr. Joseph Rosen at Our Children's House in Dallas, Texas.

On 9/10/12 Epic Health Services sent their employee, Unice Asah, RN, to care for Christian. Please note Epic Health Services provided home health care to Christian on a full-time basis in his house, and the nurses worked in 12 hour shifts from 7:00 AM to 7:00 PM, and 7:00 PM to 7:00 AM.

Please note, in January 2012, the patient had received a tracheostomy and was attached to a ventilator tube. The only time he was not on a ventilator was when he was being bathed. Even with the tracheostomy he was able to talk, and otherwise lead a reasonably active life with his family and friends.

It has been reported that on September 10, 2012, at approximately 5:00 p.m., Nurse Asah was bathing Christian in his home. There is conflicting information as to exactly what occurred next:

1.  Per the 911 call, Nurse Asah was alone and while putting Christian "back to bed" the "tracheostomy" came out.

2.  Per the Skilled Nursing Flowsheet Nurse Asah reported, "After I pulled out the dirty trach, I was unsuccessful inserting the clean 6.0 Bivona flex cuff trach. A second attempt with the 5.0 Bivona flex cuff trach available was unsuccessful."

3.  Per the response to an interrogatories propounded to Nurse Asah, her verified response was as follows:

    INTERROGATORY NO. 8: Describe in detail everything that you did with CHRISTIAN MARENTE in the one hour before his trach tube came out on September 10, 2012.

    ANSWER: Subject to and without waiving said objections, on September 10, 2012, Nurse Asah prepared to give Christian Marente a bath. She first laid out all of her supplies before getting started. That included the bath supplies, Christian's change of clothes, and all of the supplies for the tracheostomy change, including a clean 6.0 trach, a back-up (smaller) 5.0 trach, and an ambu bag - Christian's tracheostomy change occurred every Monday. Nurse Asah made all of these preparations before bathing Christian on September 10, 2012. Upon completing his bath and dressing Christian on September 10, 2012, Nurse Asah began to change his trach. The trach is held in place with soft ties that tie around his neck. She undid the ties and cleaned Christian's neck. In accordance with her standard procedure, which she had performed many times before, Nurse Asah then removed the existing trach and concurrently attempted to place the clean 6.0 trach into

CDM/MARENTE - 08/20/13                    PAGE 3

Christian's tracheostomy site, but it would not go in. She immediately grabbed the smaller, 5.0 trach and tried to place it into Christian's tracheostomy site, but it too would not go in. At that point, she immediately called 911 on her cell phone and proceeded to initiate CPR until emergency medical services arrived. In addition, please see the deposition of Nurse Asah when/if taken for further information concerning the care provided that day, as well as the relevant medical records related to this matter.

The EMT team found he had a cardiac arrest, found asystole at 1730 and absent respiratory drive. He was noted to have cyanotic skin. His capillary refill was delayed. His pupil size was pupil dilatation. Level of consciousness was unresponsive, with 0 out of 5 muscular strength. At 1754 his blood pressure was 94/62, pulse was 142, respiratory rate 13, source was supplemental. The AirEvac Lifeteam was then called at 1749 and arrived at 1809, and was with the patient at 1811. He was noted to be unresponsive level of consciousness. Loss of consciousness was noted to be "yes." His Glasgow Coma Scale was 3.

He was then transported to Children's Medical Center in Dallas, Texas. The neurology consultation note on Christian showed that the EMS was called and upon their arrival, he was still pulseless, so chest compressions were continued. He was given a dose of epinephrine it was estimated the episode of pulselessness lasted approximately 10-14 minutes, but the exact time was unclear. He was bagged in route from the Air Evac. In the Emergency Department he was given 3 liters of normal saline due to profusion, but did not require any pressure support. He was noted to have myoclonic jerks and was given Ativan 4 mg X2, Dilantin 1 gram, Keppra 1 gram, hydrocortisone and then an additional bolus of 10 mg/kg of phosphenytoin before movements decreased.

At that time, a stat CT of the head, was done on 9/10/12, showing mild volume loss involving primarily the frontal lobes, but no evidence of intercranial hemorrhage, mass effect of parenchymal edema.

He was noted to be obtunded upon arrival to the Emergency Room, but the mother stated he would walk and eat by mouth, interact with the family at home, which was his baseline prior to 09/10/2012 incident.

He was admitted to PICU and Neurology was consulted. EEG on 9/11/12 showed burst suppression pattern, but no seizure activity, and therefore anticonvulsants were stopped. The jerking was noted to be post agnostic myoclonus and not seizure activity.

He was also seen by nephrology and given Calcitrol, Lasix and immunosuppression.

MRI of the head on 9/12/12 showed extensive symmetrical infratentorial and supratentorial cytotoxic edema of the cortex, and supratentorial deep gray matter structures. These findings represent sequelae of profound global ischemic hypoxic insult.

He was seen by cardiology because of tachyarrhythmias, and had an atrial atopic tachycardia.

CDM/MARENTE - 08/20/13                    PAGE 4



Pulmonary medicine saw him and it was felt he had episodes of agitation with hypertension, tachycardia, increased respiratory rate, concerning for autonomic storming. He was given Versed, Fentanyl and Valium.

Then finally, the primary team had a long discussion with the mother about DNR.

It was noted on admission that the patient was unresponsive to verbal or tactile stimuli, but had reactive pupils and twitch like movements on exam. The reason for admission was acute respiratory distress, tracheostomy complications, altered mental status, fluid overload, kidney transplant complications, acute kidney injury, cardiac dysrhythmia, autonomic instability and cognitive dysfunction.

Attending, Dr. Matthias, M.D., made the comment 9/12/12 that they were very concerned about his neurological progression. Neurology also noted in their notes that the patient acquired stupor for 10-15 minutes, not well-documented, and had a questionable short generalized tonic-clonic seizure in the Emergency Room Department that indicated some anoxic brain injury and was loaded with phospholated Dilantin and Keppra. He noted the CT of the head and EEG. It was also noted that the prognosis had been verified after 24 hours from the event, so to keep the EEG on for now, and treatment of the myoclonic jerks could be treated with benzodiazepines, phenytoin or Valproic, though the usefulness is questionable given the very poor, prognosis.

During his hospital stay he was intermittently febrile and treated with Clindamycin and Ceftriaxone. He had occasional episodes of tachypnea, tachycardia and hypertension, probably due to neurological storming.

On 9/23/12, support was withdrawn due to the fact he had significant brain damage. His admit and final diagnoses were respiratory failure and hypoxic encephalopathy it was noted cause of death as cardiorespiratory arrest secondary to withdrawal of care, and severe brain hypoxic ischemia.

In a malpractice case, there are four elements that need to be fulfilled. There is care, breach of standard of care, causation and damages.

What is the specific conduct called into question? It is the conduct of nurse Asah, RN. who fell below the standard of care when she failed to have the proper training and education for health care for tracheostomy patients, as well as her failure to properly care for the tracheostomy, as well as to immediately call 911 to ask for medical assistance, and failure to do CPR. It is the failure of this nurse that was the sole and etiologic cause for the severe anoxic encephalopathy.

Anoxic encephalopathy is defined as the complete lack of oxygen to the brain, which in general causes an encephalopathic picture, manifested by altered mental status that is accompanied by physical changes. Basically, anoxic encephalopathy means brain damage due to lack of oxygen. in this case, it had fatal manifestations, ending in coma and death of Christian Marente.

CDM/MARENTE - 08/20/13                    PAGE 5

With regard to the standard of care for Nurse Asah the following standards are applicable:

1.  If a displaced tracheostomy tube is suspected, the standard of care requires bilateral auscultation of breath sounds, observation of chest rise and fall, and use of an exhaled $CO_2$ detector to assess for placement.

2.  The standard of care requires that obstructed tracheostomy tubes are suspected with decreased breath sounds bilaterally, or decreased chest rise and fall.

3.  The standard of care requires that saline be injected into the tracheostomy tube to thin secretions, then a properly sized suction catheter be passed into the tube and suction is applied to clear secretions from the tracheostomy tube.

4.  The standard of care for nursing requires that if the obstruction is still present, you shall repeat this procedure one time after attempting ventilation between attempts.

5.  If there is no improvement in respiratory distress, the tracheostomy tube will be changed immediately.

6.  The standard of care requires that if a tracheostomy tube does not pass easily, the attempt shall be made immediately with a smaller sized tube to re-establish an airway.

7.  After the tube is placed, assessing placement of the tube with at least two confirmatory measures such as listening to breath sounds, visualization of equal rise and fall of chest, and use of $CO_2$ detector shall be documented by the RN.

8.  The standard of care for severe airway obstruction in children requires that practitioners call early for advanced help.

9.  A reasonable and prudent nurse is required to realize the patient's critical assessment findings and initiate an emergency response immediately.

10. To have the fundamental knowledge of CPR.

11. To know tracheostomy care for a home care patient.

12. To know how to properly position, remove and replace a tracheostomy tube.

13. To know to call 911 immediately, identify herself appropriately and give the correct address of the facility.

Describe the manner in which the care failed to meet the standards.

Failures of Nurse Asah: As an RN working under the care of Epic Health Services, she was sent to care for and treat Christian Marente. Her duties included proper care and treatment of the

CDM/MARENTE - 08/20/13                    PAGE 6



tracheostomy tube.

1. She failed to have the proper training for home health care for tracheostomy patients when she undertook to replace the trach, a procedure that was not her responsibility.

2. She failed to properly reinsert the catheter in time to, prevent the severe anoxic damage.

3. She panicked when she could not reinsert the trach.

4. She failed to immediately call 911 when the crisis occurred.

5. It was also noted in the 911 dispatch call of 6 minutes, the nurse did not identify herself as a Registered Nurse, therefore valuable time was loss with the resuscitation team giving her the basic principles of CPR.

Again, although I am not a nurse, but am a medical doctor, I have had extensive training with nurses during my residency as well as post residence and in hospitals. I have given multiple lectures to nursing staff throughout my time frame as an attending physician, and I have dealt with home health care nurses in the past as well as presently in my current day practice. I have had nurses in my office, and any doctor expects a nurse to be competent enough to fulfill certain duties as indicated by her education and training.

For example, a nurse in the Cardiac Care Unit would be expected to understand cardiac patients, to be able to understand the medications, methodology and treatment of cardiac patients.

As a home health care nurse, Nurse Asah, should have had the training, expertise and knowledge, because she was advertised as such, to care for tracheostomies and treat any type of emergencies that might arise in the home, especially in the care of Christian Marente, and at least be prepared to treat any emergency that should arise in a home health care patient.

All these above failures of Nurse Asah was the sole causation of the anoxic encephalopathy, which led to the hospitalization, coma and death of Christian Marente.

This is substantiated sufficiently in the medical records. Upon arrival by the EMS services, the patient was found to be asystolic (pulseless), and respiratory depressed. In other words, not breathing. He was quadriplegic or had flaccid paralysis, i.e., not moving any extremity. His Glasgow Coma Scale was 3 out of 15. In using the scale, one is given 5 points for eye opening, 5 points for verbal response, and 5 points for motor response. He got 1 point each for having no eye opening, no verbal response and no motor response, a total score of 3. Any score below 9, according to the literature, is a very severe score, and the lower the score usually indicates less chance of recovery. According to the CDC, based on motor response, verbal performance and eye opening to appropriate stimuli of the Glasgow Coma Scale were designed and should be used to assess the depth and duration of coma and impaired consciousness. This scale helps to gauge the impact of a wide variety of conditions such as acute brain damage, and in this case,

CDM/MARENTE - 08/20/13            PAGE 7

due to severe anoxia sustained by this patient.

It is estimated the patient had lack of oxygen for at least 10-14 minutes. It is known that the brain requires a constant flow of oxygen to function normally. A hypoxic anoxic injury occurs when that flow is disrupted, essentially starving the brain and preventing it from performing vital biochemical processes. However, anoxic means a total lack of oxygen. In general, the more complete the deprivation, the more severe the harm to the brain, and the greater the consequences. Diminished oxygen supply can cause serious impairments in cognitive skills, as well as physical, psychological and other functions. Most textbook and sources state that about 5 minutes is the time we start seeing dying of the cells.(Ischemia)

According to Clay Goodman, M.D., Associate Professor of Neuropathology at Baylor College of Medicine, his 1997 Neuropathology Notes, pages 18 and 19, talk about global ischemia, which leads to widespread tissue injury, resulting in conditions referred to ischemic encephalopathy, which this patient suffered, The more severe injury may lead to dementia and spasticity, If the ischemic period is protracted, the patient may not regain consciousness, and may exhibit decorticate posturing and seizures, and may remain in a vegetative state indefinitely. Certain cell populations that are selectively vulnerable to ischemic injury include large neurons of some of the sectors of the hippocampus, Purkinje cells of the cerebellum and neurons of layers 3 and 5 of the cerebral cortex.

Not only did Christian Marente's brain undergo oxygen deprivation, the brain was also deprived of adequate blood flow.

It is also noted the patient had been found to be pulseless and without respiratory drive. It was further ascertained he had a poor Glasgow Coma Scale of 3. Upon his arrival at the Children's Medical Center in Dallas, he still had a very poor prognostic indication of being comatose with pupils dilated, and basically flaccid with no neurological response, except for pupillary reaction. This was further substantiated by the burst suppression EEG and the MRI findings, which I will elicit further on.

Prognosis Following Cardiopulmonary Resuscitation by Frank Thomke and Sasha L. Weilamann.; from the DTSCHARZTEBL 2007; 104(42)2869-85, states that patients who have undergone cardiopulmonary resuscitation have a poor prognosis. Fewer than 5% survive resuscitation on average in rural areas, while in cities up to 1/3 survive. They either die soon afterwards or else survive with severe irreversible brain damage, causing permanent unconsciousness.

Therefore, what were the parameters for the prognosis assessment of resuscitative patients? Age, underlying illnesses, etiology of cardiac arrest, type of cardiac arrhythmias, lifesaving measures, interval between from collapse to arrival to the Emergency Room, spontaneous respiration, light response, gag or cough reflex, Glasgow Coma Scale, physical findings, generalized myoclonus, pupillary light responses. The patient had generalized myoclonus and pupillary light responses. He did not have response to painful stimuli. His Glasgow Coma Scale was 3. Length of

CDM/MARENTE - 08/20/13                PAGE 8

unconsciousness was approximately 10 minutes. Electrophysiology studies such burst suppressant EEG and MRI showed characteristic cortical damage.

The MRI report of 9/12/12 showed extensive symmetrical infratentorial and supratentorial cytotic edema of the cortex and supratentorial deep gray matter structures, findings representing sequelae of profound global hypoxic/ischemic insult,

The prognosis of patients in coma with generalized myoclonus with 24 hours of cardiopulmonary resuscitation show that out of 202 studied, 191 died. Lack of motor response to anoxic stimuli of the face and limbs is considered to indicate a poor prognosis if the finding was made 3 days after resuscitation. On further studies, they did not know of any patient who had generalized or early post anoxic myoclonus combined with an EEG with burst suppression who went on to have a favorable course. Specifically, a burst suppression in EEG pattern are the absence of cerebral electrical activity in the first 2-3 days after resuscitation, and are definite signs of impending death or a persistent vegetative state, as indicated in this individual.

In "Journal of Clinical Neurophysiology," March: 14(2): 153 9165410, citation 7, Clinical Accompaniments of the Burst Suppression EEG Pattern by Reeves, Westmoreland and Clauss from the Mayo Clinic stated the burst suppression on the EEG following anoxic insult is usually associated with a poor prognosis. Myoclonic jerks may accompany the electronic bursts. The Thomke and Weilemann article also state that the clinical electrophysiological or biochemical findings unanimously point toward a poor prognosis. One can no longer assume that the patient will regain his or her premorbid functional level, or survive with only with mild neurological impairment. Therefore, brain damage has occurred of such severity that nothing better than a permanent vegetative state or persistent neurological deficit with permanent dependence on nursing care can be expected.

On 9/10/12 we initiate note that the CT scan of the head did not show any infarcts, hemorrhages or any other cause that could have led to the coma. In fact, the CT of the head did not show any events, However, within 2 days the MRI showed the characteristic changes that one would note after cell death has started occurring, with the cytotoxic edema of the infratentorial and supratentorial areas. Also it was recognized by the radiologist that these represented sequelae of profound global hypoxic/ischemic insult.

The article, "Clinical Review in Pronounced MRI Imaging and Acute Brain Injury and Coma," by Wise, Galanaud, Carpenter, Naccache, and Puybasset, coming from Critical Care 2007: 11(5): 230, October 18, states the MRI is more sensitive than CT in detecting stroke in the early phase, subtle abnormalities related to anoxic/hypoxic encephalopathy and diffuse axonal injury.

With regard to the standard of care for Epic Health Services, Inc.: Epic Health Services, Inc. had a duty to provide properly trained and experienced nurses to care for patients like Christian Marente. The standard of care required the following:

1.    When a patient with tracheostomy tube is being monitored by a nurse, the nurse must



provide a safe environment for the patient and be ready to initiate emergency measures should the need arise.

2.  All measures involving the patient must consider the possibility of accidental dislodgment of the tube and be done in such a way to minimize such risks.

3.  Epic Health Services, Inc., must ensure that nurses are be trained to understand the risk of tube displacement in order to minimize the risk of its occurring and to manage the patient should it occur.

4.  Epic Health Services, Inc., must provide for careful handling of the patient, close monitoring of the patient to plan for immediate recognition of the tracheostomy tube being displaced, and several plans for securing the airway should accidental dislodgment occur.

5.  With any deterioration in the patient's condition, or when a patient exhibits signs and symptoms of respiratory distress as Christian Marente did, dislodgment or obstruction of the tube must be considered as the possible cause, even if external parts of the tube visually appear to be normally positioned.

6.  When a tracheostomy tube becomes displaced or obstructed and there is a deterioration in the patient's condition, all applicable professional help must be immediately mobilized to remove any obstruction or correct any dislodgment. This must include immediate contact of the physician in attendance and the surgeon who placed the tracheostomy and immediate initiation of emergency code procedures.

7.  A tracheostomy tube of the same type and size as the one used, plus one of size smaller must be at the bedside. An obturator for the tube in place must be placed at the bedside in a highly visible location.

8.  The nurse must understand that a tracheostomy tube should never be subjected to being bag ventilated unless it is known to be in the trachea.

**Therefore, how did the violation of the standard of care cause injury.**

The negligence of Nurse Asah, RN, who represented Epic Health Care, by failing to properly care for a home health trached patient, inability to replace the tracheostomy in a timely fashion, and her inability to handle even simple CPR and 911 emergency calls, was the direct etiological cause of the lack of oxygen, encephalopathy and brain damage to Christian Marente. He was found to be asystolic or pulseless, and without respiratory drive, and felt he was down somewhere between 10 and 15 minutes. This is substantiated by the findings of the EMT's where they found him pulseless and without respiratory drive. It was also substantiated by the poor Glasgow Coma Scale of 3. It was further substantiated by the findings in the Emergency Room, where he had seizure activity, then myoclonus, then proceeded to have a burst

CDM/MARENTE - 08/20/13          PAGE 10

suppression EEG followed by a positive MRI, which was characteristic of a hypoxic event.

It is also well-known, as indicated above, that the brain comprises less than 5% of the body's weight, but basically consumes about 20% of the body's oxygen. Significant cerebral hypoxia and anoxia led to the death of the cells in the brain, especially the cells of the hippocampus, the Purkinje's cells and layers 3, 5 and 6.

Therefore, had Nurse Asah been more properly schooled in tracheostomy protocol, had not removed the track, or successfully removed it and replaced it with a new track, this injury would not have occurred. It was also noted the child, prior to this, was able to walk and talk, had a fairly normal neurologic exam according to prior reports. It was even noted when he appeared to the hospital the CT scan initially did not show any evidence of an infarct or any evidence of a bleed. It was only after 2 days that the MRI showed the more global effects of the anoxia.

It is my expert opinion that Nurse Asah panicked and did not act appropriately, timely or professionally during Christian's crisis. As a nurse, Nurse Asah should have been prepared to care for Christian and treat the type of emergency that happened on 9/10/12. It is further my expert opinion that Epic Health Services, Inc., failed to properly supervise Nurse Asah and failed to ensure that Nurse Asah was trained and prepared to respond to the emergency situation that occurred on 9/10/12. Accordingly, the failure on the part of Epic Health Services, Inc., to ensure that Nurse Asah was trained and prepared to deal with an anticipated situation, directly led to the injury and death of Christian Marente.

If you need any additional information, please let me know, and I will comply with any reasonable request. This report is being written in an attempt to inform all parties exactly what my opinions in this matter are, how and, why I arrived at them, what the standard of care is regarding the treatment in question, how the standard was violated, and how the violation of the standard caused the injury in question. I reserve the right to change, alter, amend or withdraw my opinions should any additional information be made to me after the date of this report.

Sincerely yours,

Charles D. Marable, M.D.
Board Certified in Neurology
Board Certified in Geriatric Medicine

CDM/bls  May be subject to transcription variance.

CDM/MARENTE - 08/20/13                 PAGE 11

5.  Curriculum vitae of Dr. Charles Marable, M.D.

## Charles D. Marable, M.D.
## Consulting Neurologist

800 8th Ave, Ste. #118, Fort Worth, TX 76104

| | |
|---|---|
| **Areas of Expertise:** | Neurology, Medical Malpractice regarding Neurological issues, Closed-Head Injuries, Medical Case Management, Pharmacology, Spinal Injuries, Toxicology |
| **Professional Experience:** | 26 years of experience in private practice, internships and hospitals; Consulting Neurologist, John Peter Smith Hospital, Ft. Worth, Texas (1986, 2004-2006) |
| | Consulting Neurologist, Veterans Administration Medical Center, Dallas, Texas (1986 only) |
| | Adjunct Clinical Instructor of Neurology, University of Texas Health Science Center at Dallas Southwestern Medical School, Dallas, Texas (1986 only) |
| | Currently on Staff at Ft. Worth and Dallas Hospitals; Medical Plaza, Baylor All Saints and Forest Park Medical Center |
| **Education/ Training** | B.S., Pharmacy Science, University of Texas at Austin<br>M.D., Universidad Autonoma de Guadalajara, 1976-1979<br>Fifth Pathway Internship, Loma Linda University Medical Center, Glendale, CA 1981 |
| | Internship in Neurology and Internal Medicine, Tulane University Medical School, New Orleans, Louisiana, July 1982- June 1983 |
| | Neurology Residency, Tulane University Medical School and Affiliate Hospitals, June 1983- June 1984 |
| | Neurology Residency, University of Texas Health Science Center at Dallas Southwestern Medical School and Affiliated Hospitals, Dallas, Texas |
| **Professional Qualifications:** | Board Certified in Neurology<br>Tarrant County Medical Society<br>Texas Medical Association<br>Texas Neurological Society<br>American Academy of Neurology |
| **Cases/Clients:** | Depositions-over 700<br>Plaintiff 90%, Defense 10%<br>Court appearances, case reviews |
| **Comments:** | Bilingual- English and Spanish |



**Charles E. Mattola, M.D.**

**Consulting Neurologist**

800 8th Ave, Ste #112, Fort Worth, TX 76104

**Areas of Expertise:** Neurology, Medical Malpractice regarding Neurological Issues, Closed-Head Injuries, Medical Care Management, Pharmacology, Spinal Injuries, Toxicology

**Professional Experience:** 26 years of experience in private practice, journalism and hospitals.
Consulting Neurologist, John Peter Smith Hospital, Ft. Worth, Texas (1986, 2004-2006)

Consulting Neurologist, Veterans Administration Medical Center, Dallas, Texas (1986 only)

Adjunct Clinical Instructor of Neurology, University of Texas Health Science Center at Dallas Southwestern Medical School, Dallas, Texas (1986 only)

Currently on Staff at Ft. Worth and Dallas Hospitals, Medical Plaza, Baylor All Saints and Forest Park Medical Center.

**Education/ Training:** B.S. Pharmacy Science, University of Texas at Austin
M.D. University of Autonoma de Guadalajara, 1975-1979
FMG Fellowship Program, Loma Linda University Medical Center, Glendale, CA 1981

Internship in Neurology and Internal Medicine, Tulane University Medical School, New Orleans, Louisiana, July 1982- June 1983

Neurology Residency, Tulane University Medical School and Affiliate Hospitals, June 1983- June 1986

Neurology Residency, University of Texas Health Science Center at Dallas Southwestern Medical School and Affiliate Hospitals, Dallas, Texas

**Professional Qualifications:** Board Certified in Neurology
Tarrant County Medical Society
Texas Medical Association
Texas Neurological Society
American Academy of Neurology

**Cases/Clients:** Depositions over 700
Plaintiff 90%, Defense 10%
Court and medical-legal reviews

**Comments:** Bilingual- English and Spanish

6. Civ. Prac. & Rem. Code Subchapter H Procedural Provisions Sec. 74.351, Sec. 74.402 and Sec. 403

alone (CPI-W:  Seasonally Adjusted U.S. City Average--All Items), between August 29, 1977, and the time at which damages subject to such limits are awarded by final judgment or settlement.

(c)  Subsection (a) does not apply to the amount of damages awarded on a health care liability claim for the expenses of necessary medical, hospital, and custodial care received before judgment or required in the future for treatment of the injury.

(d)  The liability of any insurer under the common law theory of recovery commonly known in Texas as the "Stowers Doctrine" shall not exceed the liability of the insured.

(e)  In any action on a health care liability claim that is tried by a jury in any court in this state, the following shall be included in the court's written instructions to the jurors:

(1)  "Do not consider, discuss, nor speculate whether or not liability, if any, on the part of any party is or is not subject to any limit under applicable law."

(2)  "A finding of negligence may not be based solely on evidence of a bad result to the claimant in question, but a bad result may be considered by you, along with other evidence, in determining the issue of negligence.  You are the sole judges of the weight, if any, to be given to this kind of evidence."

Added by Acts 2003, 78th Leg., ch. 204, Sec. 10.01, eff. Sept. 1, 2003.


SUBCHAPTER H.  PROCEDURAL PROVISIONS

Sec. 74.351.  EXPERT REPORT.  (a)  In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted.  The date for serving the report may be extended by written agreement of the affected parties.  Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day

after the date the defendant's answer is filed, failing which all objections are waived.

(b)   If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

(1)   awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider;  and

(2)   dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

(c)   If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency.   If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice.

[Subsections (d)-(h) reserved]

(i)   Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation.   Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

(j)   Nothing in this section shall be construed to require the serving of an expert report regarding any issue other than an issue relating to liability or causation.

(k)   Subject to Subsection (t), an expert report served under this section:

(1)   is not admissible in evidence by any party;

(2)   shall not be used in a deposition, trial, or other proceeding;  and

(3)     shall not be referred to by any party during the course of the action for any purpose.

(l)     A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).

[Subsections (m)-(q) reserved]

(r)     In this section:

(1)     "Affected parties" means the claimant and the physician or health care provider who are directly affected by an act or agreement required or permitted by this section and does not include other parties to an action who are not directly affected by that particular act or agreement.

(2)     "Claim" means a health care liability claim.

[(3) reserved]

(4)     "Defendant" means a physician or health care provider against whom a health care liability claim is asserted.  The term includes a third-party defendant, cross-defendant, or counterdefendant.

(5)     "Expert" means:

(A)     with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

(B)     with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;

(C)     with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence;

(D)     with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a dentist, a dentist or physician who is otherwise qualified

to render opinions on such causal relationship under the Texas Rules of Evidence;  or

(E)   with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a podiatrist, a podiatrist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

(6)   "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

(s)   Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for the acquisition by the claimant of information, including medical or hospital records or other documents or tangible things, related to the patient's health care through:

(1)   written discovery as defined in Rule 192.7, Texas Rules of Civil Procedure;

(2)   depositions on written questions under Rule 200, Texas Rules of Civil Procedure;  and

(3)   discovery from nonparties under Rule 205, Texas Rules of Civil Procedure.

(t)   If an expert report is used by the claimant in the course of the action for any purpose other than to meet the service requirement of Subsection (a), the restrictions imposed by Subsection (k) on use of the expert report by any party are waived.

(u)   Notwithstanding any other provision of this section, after a claim is filed all claimants, collectively, may take not more than two depositions before the expert report is served as required by Subsection (a).

Added by Acts 2003, 78th Leg., ch. 204, Sec. 10.01, eff. Sept. 1, 2003.
Amended by:

conducted outside the presence of the jury.  This subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

(f)  This section does not prevent a physician who is a defendant from qualifying as an expert.

(g)  In this subchapter, "physician" means a person who is:

(1)  licensed to practice medicine in one or more states in the United States;  or

(2)  a graduate of a medical school accredited by the Liaison Committee on Medical Education or the American Osteopathic Association only if testifying as a defendant and that testimony relates to that defendant's standard of care, the alleged departure from that standard of care, or the causal relationship between the alleged departure from that standard of care and the injury, harm, or damages claimed.

Added by Acts 2003, 78th Leg., ch. 204, Sec. 10.01, eff. Sept. 1, 2003.


Sec. 74.402.  QUALIFICATIONS OF EXPERT WITNESS IN SUIT AGAINST HEALTH CARE PROVIDER.  (a)  For purposes of this section, "practicing health care" includes:

(1)  training health care providers in the same field as the defendant health care provider at an accredited educational institution;  or

(2)  serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

(b)  In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1)  is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2)  has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim;  and

(3)  is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c)  In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1)  is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim;  and

(2)  is actively practicing health care in rendering health care services relevant to the claim.

(d)  The court shall apply the criteria specified in Subsections (a), (b), and (c) in determining whether an expert is qualified to offer expert testimony on the issue of whether the defendant health care provider departed from accepted standards of health care but may depart from those criteria if, under the circumstances, the court determines that there is good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.

(e)  This section does not prevent a health care provider who is a defendant, or an employee of the defendant health care provider, from qualifying as an expert.

(f)  A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the 21st day after the date of the witness's deposition.  If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances.  The court shall conduct

a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial. If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury. This subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

Added by Acts 2003, 78th Leg., ch. 204, Sec. 10.01, eff. Sept. 1, 2003.

Sec. 74.403. QUALIFICATIONS OF EXPERT WITNESS ON CAUSATION IN HEALTH CARE LIABILITY CLAIM. (a) Except as provided by Subsections (b) and (c), in a suit involving a health care liability claim against a physician or health care provider, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

(b) In a suit involving a health care liability claim against a dentist, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed if the person is a dentist or physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

(c) In a suit involving a health care liability claim against a podiatrist, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed if the person is a podiatrist or physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

(d) A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the 21st day after the date of the

witness's deposition.   If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances.   The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial.   If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury.   This subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

Added by Acts 2003, 78th Leg., ch. 204, Sec. 10.01, eff. Sept. 1, 2003.


SUBCHAPTER J. ARBITRATION AGREEMENTS

    Sec. 74.451.  ARBITRATION AGREEMENTS.   (a)   No physician, professional association of physicians, or other health care provider shall request or require a patient or prospective patient to execute an agreement to arbitrate a health care liability claim unless the form of agreement delivered to the patient contains a written notice in 10-point boldface type clearly and conspicuously stating:
UNDER TEXAS LAW, THIS AGREEMENT IS INVALID AND OF NO LEGAL EFFECT UNLESS IT IS ALSO SIGNED BY AN ATTORNEY OF YOUR OWN CHOOSING. THIS AGREEMENT CONTAINS A WAIVER OF IMPORTANT LEGAL RIGHTS, INCLUDING YOUR RIGHT TO A JURY. YOU SHOULD NOT SIGN THIS AGREEMENT WITHOUT FIRST CONSULTING WITH AN ATTORNEY.
    (b)   A violation of this section by a physician or professional association of physicians constitutes a violation of Subtitle B, Title 3, Occupations Code, and shall be subject to the enforcement provisions and sanctions contained in that subtitle.
    (c)   A violation of this section by a health care provider other than a physician shall constitute a false, misleading, or deceptive act or practice in the conduct of trade or commerce within the